Filed 10/26/20  P. v. Riberal CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>BRANDON ROCKY RIBERAL et al.,<br><br>        Defendants and Appellants. | C077018<br><br>(Super. Ct. Nos. SF123374A, SF123374B, SF123374C)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[CHANGE IN JUDGMENT] |

BY THE COURT:

It is ordered that the opinion filed herein on September 29, 2020, be modified as follows:

1.  On page 4, third full paragraph beginning with "Rocky's jury," delete the word "premeditated" from the first sentence, so that the modified sentence now reads:

1

Rocky's jury found him guilty of the second degree murder of Valverde (count 1), and guilty of counts 2, 4, and 5 (attempted murder of Jorge, conspiracy to commit murder, and shooting a firearm from a vehicle, respectively).

2. Add the following sentence to the end of the paragraph that begins on page 5 and concludes on page 6:

The section 12022.53, subdivision (e)(1) firearm enhancements must be stricken, as a violation of section 186.22, subdivision (b) is an element of the enhancement.

3. Add the following sentence at the end of the first full paragraph on page 26 that begins with "We must determine":

We shall also reverse the section 12022.53, subdivision (e) enhancements.

4. Add the following to the end of the first full paragraph on page 30 that begins with "As a result":

Reversal of the gang enhancements also requires reversal of the vicarious liability firearm enhancements under section 12022.53, subdivision (e) as a violation of section 186.22 is an element of the enhancement. (*People v. Cornejo* (2016) 3 Cal.App.5th 36, 50.) The section 12022.53 enhancements not based on vicarious liability still stand. (*Cornejo,* at p. 50.)

5. The words "as to the remaining firearm enhancements" are added to end of the last sentence to part X of the Discussion, at the beginning of page 55, so that the modified sentence reads:

We will follow the general rule and allow the trial court the opportunity to exercise its discretion in the first instance as to the remaining firearm enhancements.

6. Add the following sentence to the beginning of the Disposition on page 55, as a new paragraph:

As to all defendants, the vicarious firearm enhancements under 12022.53, subdivision (e)(1) are reversed.

Rocky Riberal's request for supplemental briefing is denied.

The petitions for rehearing are denied.

This modification changes the judgment.

FOR THE COURT:


_____/s/_____
RAYE, P. J.



_____/s/_____
BLEASE, J.



_____/s/_____
BUTZ, J.*

---

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C077018 |
| Plaintiff and Respondent, | (Super. Ct. Nos. SF123374A, SF123374B, SF123374C) |
| v. | |
| BRANDON ROCKY RIBERAL et al., | |
| Defendants and Appellants. | |

Brandon Rocky Riberal and Raymond Valles, together with Vincente Yanez and Carlos Zendejas, drove a Ford Explorer leased by Brandon's father, Rocky Riberal,[1] to a Stockton nightclub, where they fired multiple rounds from firearms supplied by Rocky, at nightclub patrons who were in the parking lot.[2]  Eric Valverde was killed.  He was

---

[1]     In instances where parties share the same surname, we refer to them by their first names to avoid confusion.

[2]     Yanez and Zendejas were arrested and charged, but were not tried with Brandon, Rocky, and Valles.

1

accompanied by Serina and Jorge C. Serina was grazed by a bullet, but Jorge was unhurt. There was evidence that Brandon and Valles were members of the Norteño subset known as Garden Block gang, and that Valverde and Jorge, as well as others in the crowd, were associated with rival Norteño subsets.

A grand jury brought an indictment against Brandon, Rocky, and Valles. Two juries were empaneled to try the case—one for Brandon and Valles, and one for Rocky. The jury found Brandon and Valles guilty of the first degree murder of Valverde (Pen. Code, § 187—count 1),[3] premeditated, deliberate, and willful attempted murder of Jorge (§ 664/187—count 2), conspiracy to commit murder (§ 182, subd. (a)(1)—count 4), shooting a firearm from a vehicle (§ 26100, subd. (c)—count 5), possession of a firearm by a gang member (§ 25400, subd. (c)(3)—count 6), carrying a loaded firearm while an active participant in a criminal street gang (§ 25850, subd. (c)(3)—count 7), and active participation in a criminal street gang (§ 186.22, subd. (a)—count 8). Additionally, the jury found true as to count 1 the special circumstance allegations that Brandon and Valles were active participants in a criminal street gang and committed the murder to further the activities of the gang (§ 190.2, subd. (a)(22)), and that the murder was committed while discharging a firearm from a motor vehicle (§ 190.2, subd. (a)(21)).

Also, as to count 1, the jury found true the enhancement allegations that Brandon and Valles personally used a firearm (§ 12022.53, subd. (b)), were principals and that a principal personally used a firearm (§ 12022.53, subds. (b) & (e)(1)), intentionally and personally discharged a firearm (§ 12022.53, subd. (c)), were principals and a principal intentionally and personally discharged a firearm causing great bodily injury or death to Valverde (§ 12022.53, subds. (c) & (e)(1)), intentionally and personally discharged a firearm causing great bodily injury or death to Valverde (§ 12022.53, subd. (d)), were

---

**3**      Undesignated statutory references are to the Penal Code.

2

principals and a principal intentionally and personally discharged a firearm causing great bodily injury or death to Valverde (§ 12022.53, subds. (d) & (e)(1)), personally used a firearm in the commission of the crime (§ 12022.5, subd. (a)), and committed the murder for the benefit of, at the direction of, or in association with a criminal street gang to promote, further, or assist in any criminal conduct by gang members (§ 186.22, subd. (b)(1)).

As to count 2, the jury found true the enhancement allegations that Brandon and Valles personally used a firearm (§ 12022.53, subd. (b)), were principals and that a principal personally used a firearm (§ 12022.53, subds. (b) & (e)(1)), intentionally and personally discharged a firearm (§ 12022.53, subd. (c)), were principals and a principal intentionally and personally discharged a firearm causing great bodily injury or death to Valverde (§ 12022.53, subds. (c) & (e)(1)), intentionally and personally discharged a firearm causing great bodily injury or death to Valverde (§ 12022.53, subd. (d)), were principals and a principal intentionally and personally discharged a firearm causing great bodily injury or death to Valverde (§ 12022.53, subds. (d) & (e)(1)), personally used a firearm in the commission of the crime (§ 12022.5, subd. (a)), and committed the attempted murder for the benefit of, at the direction of, or in association with a criminal street gang to promote, further, or assist in any criminal conduct by gang members (§ 186.22, subd. (b)(1)).

As to count 4, the jury found true the allegations that Brandon and Valles committed one or more of the alleged overt acts, that during the murder they personally used a firearm (§ 12022.53, subd. (b)), that during the murder they were principals and that a principal personally used a firearm (§ 12022.53, subds. (b) & (e)(1)), that they intentionally and personally discharged a firearm (§ 12022.53, subd. (c)), that they were principals and a principal intentionally and personally discharged a firearm causing great bodily injury or death to Valverde (§ 12022.53, subds. (c) & (e)(1)), that they intentionally and personally discharged a firearm causing great bodily injury or death to

3

Valverde (§ 12022.53, subd. (d)), that they were principals and a principal intentionally and personally discharged a firearm causing great bodily injury or death to Valverde (§ 12022.53, subds. (d) & (e)(1)), that they personally used a firearm in the commission of the crime (§ 12022.5, subd. (a)), and that the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang to promote, further, or assist in any criminal conduct by gang members (§ 186.22, subd. (b)(1)).

As to count 5, the jury found the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang to promote, further, or assist in any criminal conduct by gang members. (§ 186.22, subd. (b)(1).) The jury found Brandon and Valles not guilty of the attempted murder of Serina, count 3.

The trial court sentenced Brandon and Valles each to life without the possibility of parole (LWOP) plus 57 years to life in prison as follows: LWOP for premeditated first degree murder (count 1), plus 25 years to life for the associated firearm enhancement (§ 12022.53, subds. (d) & (e)(1)), and seven years to life for premeditated attempted murder (count 2) plus a consecutive 25-year-to-life term for the associated firearm enhancement. (§ 12022.53, subds. (d) & (e)(1).) The sentences on the remaining counts and allegations were stayed pursuant to section 654.

Rocky's jury found him guilty of the second degree murder of Valverde (count 1), and guilty of counts 2, 4, and 5 (premeditated attempted murder of Jorge, conspiracy to commit murder, and shooting a firearm from a vehicle, respectively). As with Brandon and Valles, the jury found all enhancement allegations to be true. The jury found Rocky not guilty on count 3 (attempted murder of Serina) and found that the attempted murder of Jorge was not premeditated.

The trial court sentenced Rocky to 82 years to life as follows: 25 years to life for conspiracy to commit murder (count 4), plus a consecutive term of 25 years to life for the associated firearm enhancement; a consecutive seven-year term for attempted murder of

4

Jorge (count 2), plus 25 years to life for the associated firearm enhancement. The sentences on the remaining counts and allegations were stayed pursuant to section 654.

Brandon and Valles argue the attempted murder conviction must be reversed because there was no evidence to support the trial court's kill zone instruction, as there was no evidence they used lethal force that was designed to kill everyone in the area of the targeted victim. We conclude there was sufficient evidence to support the instruction. Defendants fired approximately 20 rounds from a vehicle into a group of unsuspecting people in a parking lot. These facts are in all material respects no different from the Supreme Court's seminal kill zone case, *People v. Bland* (2002) 28 Cal.4th 313, 331 (*Bland*), which upheld the theory where two defendants shot "a flurry of bullets at a fleeing car." This case is dissimilar to *People v. Canizales* (2019) 7 Cal.5th 591, 611 (*Canizales*), decided more recently by the Supreme Court, which held there was insufficient evidence to give a kill zone instruction where the evidence showed that the defendant "attacked his [fleeing] target by firing five bullets from a nine-millimeter handgun at a distance of either 100 or 160 feet away[,] and that "the attack occurred at a block party on a wide city street, not in an alleyway, cul de sac, or some other area or structure from which victims would have limited means of escape." That case also does not invalidate the instruction on kill zone liability given here.

Rocky argues the evidence of his intent to kill was insufficient to convict him of attempted murder as an aider and abettor. We conclude there was sufficient evidence Rocky aided his codefendants' commission of murder knowing of their intent to kill. This was sufficient for his attempted murder conviction.

All defendants argue that following the Supreme Court's decision in *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*), the evidence presented was insufficient to find that they were members of a criminal street gang and that they committed the crime to benefit the gang. We conclude that under the circumstances presented, the evidence did not satisfy the requirement set forth in *Prunty*, that the gang proven to exist through its

5

primary activities and predicate acts was the same gang defendants sought to benefit. We shall therefore reverse the gang enhancements and special circumstance. We conclude, however, that the evidence was sufficient to prove Brandon and Valles were active gang participants, and that as gang members they carried a concealed firearm and carried a loaded firearm.

All defendants argue the Supreme Court's decision in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), rendered the prosecution gang expert's testimony inadmissible hearsay and violated their right to confront witnesses in violation of the Sixth Amendment. We conclude that most of the expert's testimony was admissible, and the admission of the inadmissible hearsay was harmless.

Valles and Brandon argue the trial court's refusal to grant their section 995 motion to set aside the gang charges resulted in the admission of highly inflammatory gang evidence, depriving them of due process and a fair trial. We conclude there was sufficient evidence to support the gang allegations.

All defendants claim the conspiracy conviction must be reversed, as well as the murder conviction, because the trial court instructed the jury it must find that one of the defendants committed an overt act in furtherance of the conspiracy, and some of the overt acts described to the jury occurred after the completion of the murder. We conclude two of the overt acts were improper, but the error was harmless beyond a reasonable doubt.

Defendants argue, and the People concede, the trial court erred in not instructing the jury on all of the elements of counts 6 and 7, carrying a concealed firearm by a gang participant and carrying a loaded firearm by a gang participant, respectively. Nevertheless, we find the error harmless, except as to Valles's conviction for count 6, because it is clear beyond a reasonable doubt the jury would have found defendants guilty of the charges absent the error.

Rocky argues it was error for the trial court to allow additional closing argument after the jury indicated it was unable to reach a verdict. We find no abuse of discretion.

6

Valles was 17 years old when he committed the crimes. We will conditionally reverse Valles's conviction and remand to the juvenile court to conduct a transfer hearing. Valles's claim that his LWOP sentence is cruel and unusual punishment is moot with the passage of section 3051, subdivision (b)(4), which gives him the possibility of release after 25 years. We will, however, remand for a hearing pursuant to *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), if the juvenile court determines transfer to adult court is appropriate.

We will remand to the trial court to permit it to exercise its discretion to strike the firearm enhancements. It did not have such discretion when defendants were sentenced.

FACTUAL AND PROCEDURAL BACKGROUND

Serina and Jorge went with a large group of friends, including the murder victim Eric Valverde, to Evviva, a Stockton nightclub. Jorge was associated with the Norteño criminal street gang. Others in their group included Tony Villalvazo, a documented gang member associated with South Side, Raphael Villalvazo, a documented West Side Norteño, and Eduardo Villalvazo, a documented Norteño. The atmosphere at the nightclub was more hostile than usual. There were several altercations inside the club. Things were getting out of hand, and the decision was made to close the club early. Serina asked Valverde to help her get Jorge so they could leave. Jorge was drunk and was generally being loud and obnoxious. She, Jorge, and Valverde left the club. As they left, there were fights going on—both men and women. Jorge broke up the fight between the women, and Serina, Jorge, and Valverde walked on toward the parking lot to their car.

A group of men were fighting at the entrance to the parking lot. Serina saw one of the men shoot a gun up into the air. He appeared to shoot three times. Serina, Jorge, and Valverde continued on to the car. Serina and Valverde were having a hard time getting Jorge to the car, and Valverde had Jorge in a bear hug, trying to get Jorge to go to the car.

7

While the trio was still on the sidewalk at the entrance to the parking lot, a new white Ford Explorer pulled up and Serina saw red beams on herself, Jorge, and in the area of all of them. The red beams were laser sights, and they were coming from the front and back passenger side of the Ford Explorer. The bullets started going off. It lit up the inside of the Explorer. One witness saw three people in the Explorer. Valverde still had Jorge, and was facing Jorge, while Jorge was facing the street where the Explorer had pulled up. One of the shots hit Valverde in the back, killing him. He let go of Jorge and fell to the ground.

The Explorer sped away, going east down Alder. A man standing in the street wearing a striped shirt shot back at the Explorer. The Explorer continued down Alder before crashing.

Jorge told Serina to get the car. She pulled the car up next to Valverde, intending to get Valverde into the car to take him to the hospital. However, the police came as soon as she got the car next to Valverde. Serina was taken to the police station and questioned all night. When Serina got home the next morning she noticed that a bullet had grazed her stomach.

Deanna G., who lived near Evviva, heard a crash and gunshots. She looked out her balcony and saw the crashed Explorer. She saw a young man wearing a baseball cap get out of the passenger side of the Explorer. She heard people arguing and yelling, but only saw one man. He was about 17 years old and skinny. He reached in and grabbed something out of the passenger side of the vehicle, then closed the door. She then saw the young man drop a gun into a grassy area before running away. He ran to the alleyway. She could hear voices arguing in the alley. A white pickup dropped off another man near the Explorer, then left. Then, a red pickup came and picked up the man wearing the baseball cap.

Kevin B., who also lived near Evviva, heard the Explorer crash and saw it up against the curb. He went over to the Explorer and saw that it had a hole on the front

8

door, the front driver's side wheel was almost off, and fluid was leaking out of the vehicle. No one was in the Explorer. Kevin went back to his house. He came out again later when he heard a commotion. A silver Dodge Ram drove to the wrecked Explorer and a man got out. The Dodge Ram left. The man tried and failed to start the Explorer and took something out of the trunk. Kevin asked the man if everything was all right.

Eventually the police came and made contact with the man at the Explorer. The man at the Explorer was defendant Rocky Riberal. He testified that he was at home watching television when he got a call from his son Brandon. He said he let Brandon borrow a white Ford Explorer he had rented. Brandon sounded frantic and asked Rocky to come pick him up. Rocky testified he drove his Dodge Ram pickup and picked up Brandon near a Taco Bell. Defendant Valles, who is Rocky's nephew, and one or two other persons were with Brandon. He drove the men to the hospital. Valles got out at the hospital. Rocky then followed Brandon's directions to the Ford Explorer. Rocky got out, and the truck drove off. Rocky tried to start the Explorer. He started it, but it would not drive. Fluid was leaking out of the Explorer, the tire was bent, there was a bullet hole in the passenger side, and there was blood on the seat.

When the police came, Rocky testified he told them he had been driving the Explorer, that Valles called him for a ride, and that Valles was shot as he was trying to get in the Explorer. Rocky told police that when Valles got shot, Rocky got scared, drove off, and wrecked the car. The police officer who spoke to Rocky at the scene testified Rocky told him he had picked up Valles at the corner of Pacific and Alder. As they drove east on Alder, they were shot at, and Valles got shot. Rocky sped up and lost control of the Explorer, which hit the curb. As one of the police officers put handcuffs on Rocky, the officer saw a text message Rocky sent to someone. The message said, "The cops don't believe me. I'm fucked."

9

Valles was treated at St. Joseph's Hospital between 2:00 and 4:00 a.m. for a gunshot wound to his right forearm. The surgeon found two bullet fragments in the wound. Some of the bone was missing.

Valverde was killed by a single gunshot that entered at his lumbar back, traveled leftward entering his left chest cavity, perforated his left lung and pericardium, lacerated his heart through-and-through, and perforated the soft tissue of the mediastinum and chest wall. The bullet recovered from Valverde's body was a hollow-point bullet. Hollow-point bullets are designed to be more lethal than regular bullets.

A. *Crime Scene Evidence*

At the primary crime scene, police found 14 .45-caliber casings, a spent bullet jacket, three nine-millimeter Luger casings, and three .40-caliber Smith & Wesson casings. Four vehicles that were parked on the south side of West Alder also had bullet strike damage. Police also found casings, spent bullets, and bullet strikes along the residential properties on West Alder, east of the area in front of Evviva.

The Ford Explorer had bullet strikes to the front passenger wheel hubcap and a bullet hole in the frame between the front and rear passenger doors. The bullet hole in the side of the Explorer appeared to have been caused by a bullet fired from inside the vehicle. The interior of the Explorer contained eight .45-caliber shell casings and four nine-millimeter shell casings. A nine-millimeter Smith & Wesson semiautomatic handgun was found under the rear portion of the front passenger seat. The gun had one chambered round and three live rounds in the attached magazine. It had a laser sight affixed to the top that was operative and emitted a red laser light. The nine-millimeter Smith & Wesson fired the three nine-millimeter casings found at the crime scene and the four nine-millimeter casings found in the Explorer.

The driver's side door pocket of the Explorer contained three CDs with labels, including the label, "GBG." There was blood on the front passenger seat, interior door, and doorframe. There was also a bone fragment in the blood. There was a blood trail

10

from the Explorer crash site south on Center Street and down an alley east toward El Dorado Street. The DNA from the blood in the Explorer and the trail matched Valles's DNA. On the exterior of the explorer were fingerprints matching Carlos Zendejas, Vincente Yanez, and defendants Rocky, Brandon, and Valles. Brandon's fingerprints were on the CD sleeve inside the Explorer.

B. *Evidence Following Arrest of Defendants*

A search of Brandon's house at the time of his arrest produced a shoebox containing 32 live nine-millimeter rounds, documentation for a Sprint cell phone under the name Rocky Riberal, and gang-related clothing. A Chevy Malibu parked at the house contained a box of 90 live .22-caliber bullets in the glove box. In the garage was a high-capacity magazine with eight nine-millimeter live rounds inside and a box for a Smith & Wesson nine-millimeter semiautomatic handgun. Rocky's Dodge Ram pickup, which was parked in front of the house Brandon lived in with his mother, contained a Stockton Gun Exchange sales tag for a "Cobra Patriot .45 ACP," a laser sight with attached rail to affix it to a firearm, a Cobra firearm pamphlet, a Patriot series owner's manual, and a number of gang-related CDs.

A search of Rocky's house following the incident turned up a receipt for the rental of the Explorer, a shoulder-holster, and eight letters addressed to Brandon. The letters were from other gang members and contained gang references.

Yanez and Brandon were friends. In the trunk of the car in which Yanez was arrested was an opened box of .45-caliber ammunition with 17 live rounds. Yanez had the letters GBG tattooed on his neck. Yanez lived with his aunt, Patricia Fajardo. Officers collected gang-related paraphernalia, photos, and clothing from their residence, as well as over 30 shell casings and some bullets from the backyard. Fajardo's son, Lawrence "Chapo" Avalos, a member of the Garden Block gang was murdered in October 2011. Fajardo reported on March 16, 2012, that her Cobra Patriot .45 handgun and her Smith & Wesson nine-millimeter handgun had been stolen. The nine-millimeter

11

was the gun found in the Explorer. Rocky was with Fajardo when she purchased the Cobra handgun. Rocky had accompanied Fajardo to the Stockton Gun Exchange other times as well.

Rocky started bringing guns into his house in late February before the incident at the end of March. Before that time Rocky only had a shotgun in the house. Gang members with the initials GBG tattooed on their necks hung out at Rocky's house.

C. *Cell Phone Evidence*

1. Rocky's Cell Phone

Rocky's cell phone contained several pictures of guns and ammunition. There were also many text messages regarding guns, ammunition, and a bulletproof vest, indicating Rocky was engaged in the purchase and sale of those items.

On February the 29th before the murder on March 30, Rocky sent the following text to Brandon: "Hey i got rid of her so im home alone . . . Hey send me a pic of eddie." Eddie Camacho was a documented Norteño member of the Sinners Click subset. Rocky's contacts included a number for Camacho and referred to him as "Buster," a derogatory term toward a rival Norteño gang member.

On March 29, one day before the murder, Rocky texted Brandon that he had gone to Walmart and purchased .45-caliber and nine-millimeter hollow-point bullets for Brandon. He also texted Brandon that he got a safe to put the "g's" in, and that he had texted Brandon the code. Phone records indicated Brandon called Rocky at 12:33 a.m. on March 31, and that the phone was located in the area of the shooting. At 1:30 a.m., Rocky texted Brandon: "Man im fuckd jr they are taking me to jail they d." Brandon replied, "U ok?" At 8:30 in the morning Rocky answered, "Ya but tell ray to go along with the story."

2. Valles's Cell Phone

Valles's phone had a number of gang-related songs and videos on it. Each time Valles sent a text message, the signature tag "GBG 14" was displayed.

Both Valles's phone and Brandon's phone were in the area of the shooting at the time of the incident.

D. *Gang Evidence*

The prosecution presented the testimony of gang expert, Detective Jason Mamaril. Mamaril testified that the natural and normal enemy of the Norteño criminal street gang member is the Sureño criminal street gang member. However, much of the Norteño hierarchy was in prison, leaving a leadership vacuum, and no one to report to. In addition to the leadership vacuum, the city of Stockton was so overpopulated with Norteño gangs, that the Norteño gangs began attacking each other, rather than fighting their natural enemy. There were at least 15 Norteño subsets in the city of Stockton. Garden Block Gangsters, or GBG is a Norteño subset. It utilizes some of the same symbols as the Norteño criminal street gang. GBG started on Garden Street in Stockton.

Sinners Click, or SC, is another criminal street gang that is a Norteño subset. Sinners Click and Garden Block have problems and differences with each other. Starting in 2009, there were approximately 10 homicides between the two sides, and Garden Block was "way behind in the body count[,]" losing a lot more members than Sinners Click. Garden Block aligns with Vario Latinos Locos and Triple Six Gangsters. On the other side, Sinners Click aligns with South Side Stocktone and West Side Norteños.

Mamaril testified that if the gang were a company, the Nuestra Familia would be its board of directors, and the Norteños would be the soldiers, or the representative of the Nuestra Familia on the streets. Most of the Nuestra Familia are in prison, so they communicate via kites—notes that are exchanged in prison. They did not want the various subsets infighting, so they sent instructions through kites to the subsets to stop the infighting. Even though the subsets have been fighting each other, none of them have broken away from the Norteños to create their own gang.

Mamaril testified he had reviewed documentation that indicated defendants exercised with other Norteño members while in prison, and that a person is considered in

13

good standing with the gang if they are seen walking with a fellow gang member while in custody. Mamaril opined that Brandon and Valles were active Norteño gang members in the Garden Block gang subset, and that Rocky was an active Norteño gang member.

Several of the people who were at the club with Serina were also members of the Norteño gang, but of rival subsets to the Garden Block Norteños. Raphael Villalvazo was a Norteño of the West Side Norteño subset. Tony and Eduardo Villalvazo were Norteños affiliated with the South Side subset. Jorge was also a Norteño and was related to West Side and South Side members. Valverde, the murder victim, had been with two documented South Side Stocktone members at a restaurant, when they were shot at in an apparent gang shooting.

Brandon had a number of gang-related tattoos. He had "GB" tattooed below his left eye, "GBG" on his neck, "Garden" across his chest, a Stockton Ports logo on his left arm, "209" on his left arm, "Mi Vida Loca" on his left arm, Garden and Main street signs on his left arm, four dots above his left wrist, "X" in the webbing on his right hand, "4" in the webbing on his left hand, "Block Boy" above his wrists, "Garden" on one leg and "Blocksta" on the other leg. Pictures from Brandon's cell phone showed him wearing gang colors, displaying gang signs, and associating with other gang members. Brandon had a number of gang-related police contacts prior to the incident, and several gang-related incidents while in custody.

Valles also had several gang-related tattoos. He had "GBG" on his left hand, "ESN" for East Side Norteño on his right hand, one dot on his right hand and four dots on his left hand, "GBG" over his left eye, and a tattoo commemorating Chapo, a dead Garden Block Norteño.

Rocky had no prior gang affiliation of which the authorities were aware.

14

DISCUSSION

I

Kill Zone Instruction

All three defendants were convicted of the attempted murder of Jorge.[4] "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) The theory of transferred intent does not apply to attempts. "The crime of attempt sanctions what the person intended to do but did not accomplish, not unintended and unaccomplished potential consequences." (*Bland, supra*, 28 Cal.4th at p. 327.) Thus, to prove defendants were guilty of attempted murder the prosecution had to prove that defendants had the intent to kill Jorge.

The jury was instructed that to find defendants guilty of attempted murder, it must find that defendants had an intent to kill. They were instructed: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of Jorge . . . the People must prove that the defendant not only intended to kill Eric Valverde but also either intended to kill Jorge . . ., or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill Jorge . . . or intended to kill Eric Valverde by killing everyone in the kill zone, . . . then you must find the defendant not guilty of the attempted murder of Jorge . . . ."

All defendants argue there was insufficient evidence to support a kill zone instruction. Defendants argue there was no evidence from which the jury could infer they used lethal force that was designed to kill everyone in the area of the targeted victim, as opposed to force that was designed to put everyone in the victim's vicinity at risk of

---

**4**     All three defendants were also charged with the attempted murder of Serina, but all were found not guilty.

harm. Brandon argues there is no evidence defendants fired multiple shots into a crowd of people, because the crowd of people dispersed after someone fired a shot into the air, and this happened before any shots were fired from the Explorer. Even assuming this statement is true, it does not aid defendants.

The evidence presented was susceptible of the inference that defendants intended to kill Valverde or Jorge by killing everyone in their vicinity. There was evidence the motive for the shooting was gang related. Defendants were either members of or associated with the Norteño subset, Garden Block gang. Valverde had been associated with another Norteño subset, South Side Stocktone, a rival gang. Jorge was a gang member related to members of the West Side and South Side Norteño subsets, both rivals of the Garden Block gang. Thus, defendants could have targeted Valverde and/or Jorge specifically.

Assuming Valverde alone was the target, there was sufficient evidence to support a kill zone instruction. There was evidence that at least 20 shots were fired from the Explorer, and that Valverde had Jorge in a bear hug. Serina remembered seeing the red dots of the laser sights on all three of them and in the area "going everywhere." It was dark and the Explorer was moving.

The facts of this case are the same in all material respects to the facts of *Bland, supra*, 28 Cal.4th 313, the California Supreme Court's seminal case on the kill zone theory of attempted murder. There, two gang members shot at and into a vehicle, hitting and killing the driver, who was the target, but also hitting and wounding the passengers, who were not gang members. (*Id*. at p. 318.) Citing *Ford v. State* (1993) 330 Md. 682 [625 A.2d 984], the Supreme Court explained that the kill zone theory describes a form of concurrent intent " 'when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.' " (*Bland,* at pp. 229-330.) An example given was " 'a defendant who intends to kill A and, in order to ensure

16

A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire . . . .  The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim.  When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets . . . the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death.' "  (*Id.* at p. 330.)

Here, defendants escalated their mode of attack from a single bullet to a hail of bullets.  Defendants fired at least 20 rounds, evidenced by 14 .45-caliber casings, a spent bullet jacket, three nine-millimeter Luger casings, and three .40-caliber Smith & Wesson casings being found at the scene.  The victims were caught unaware, with no opportunity of escaping in time.  Based on the examples in *Bland*, this was a classic kill zone case.

This case is distinguishable from *Canizales, supra*, 7 Cal.5th 591, in which the Supreme Court determined the evidence was insufficient to support a kill zone instruction as to a nontargeted individual, where a single gunman fired five rounds from a distance of around 160 feet at a target who, having been alerted to the danger, was running away. (*Id*. at p. 600.)  Here, defendants' firepower was significantly greater, the distance to the targets was closer, the shots were fired from a vehicle, and the surprised victims had no ready path of escape.[5]

Defendants claim the prosecutor was incorrect when she argued in closing that the defendants merely intended to kill someone when they shot into a crowd multiple times.

---

[5]    Although the record does not state the distance between the victims and the shooters, Serina testified the shots were fired from a vehicle that was on the street at the entrance to the parking lot, and when the shots were fired, she, Valverde, and Jorge were in the parking lot at the entrance.

The prosecutor argued: "If they acted with the intent when they placed the guns out of the window, and they shot multiple times, with multiple people, in the direction of another human being, clearly, their intent is to kill someone." This was not a misstatement of the law. "[A] person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An indiscriminate would-be killer is just as culpable as one who targets a specific person." (*People v. Stone* (2009) 46 Cal.4th 131, 140.) It is true that this does not accurately describe the kill zone theory, but the kill zone instruction was correct as given.

Defendants also complain that the prosecutor misstated the law when she argued the jury could convict on a kill zone theory if the defendants, in attempting to kill one person, "place other people at risk of also being killed." The prosecutor continued: "Therefore, that intent is carried over to those other individuals. Whether he intended to kill Eric Valverde, Tony Villalvazo, Rafael Villalvazo, Serina [], Jorge [], they created a kill zone to ultimately complete their intention of murdering someone, and they did." Any claim that the prosecutor misstated the law during argument is foreclosed on appeal unless the defendant made a timely objection. (*People v. Morales* (2001) 25 Cal.4th 34, 43-44.) No such objection was made.

The trial court gave a legally correct kill zone instruction, set forth above. The court also instructed the jury that it must follow the law as given by the court even if it conflicted with the attorneys' comments. It was the duty of the trial court, not the attorneys, to instruct on the law. The trial court gave a correct instruction. We assume the jury followed the instruction given by the trial court. (*People v. Doolin* (2009) 45 Cal.4th 390, 442.)

At oral argument, defendants contended that, pursuant to *Canizales*, the instruction inadequately defined kill zone. The argument relies on the following passage from *Canizales, supra*, 7 Cal.5th 591: "We therefore conclude that the kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may

18

properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Id.* at p. 607.) The defense asserted at oral argument that the convictions for the attempted murder cannot stand because the instruction did not require the jury to make such findings before rendering a guilty verdict on the attempted murder count.

The Supreme Court in *Canizales* summarized its holding as follows: "We conclude there was not sufficient evidence in the record to support an instruction on the kill zone theory, and that the error requires reversal of the attempted murder convictions at issue because those convictions may have been based on the kill zone theory even though that theory was not properly applicable." (*Canizales, supra*, 7 Cal.5th at p. 597.)

The Supreme Court also stated: "Defendants raise the additional argument that instructing pursuant to CALCRIM No. 600, the current standard instruction regarding attempted murder, violated defendants' federal constitutional rights to due process because it led the jurors to believe they could convict defendants of the attempted murder of one victim without finding the requisite intent to kill. In light of our conclusion that the judgment must be reversed because the evidence was insufficient to support an instruction on the kill zone theory, we need not address defendants' constitutional challenge to CALCRIM No. 600." (*Canizales, supra*, 7 Cal.5th at pp. 597-598.)

The passage from page 607 of *Canizales* upon which defendants rely is preceded by the Supreme Court's discussion of the risks associated with the kill zone theory because it so often relies on circumstantial evidence, and intent to kill cannot be inferred

19

if there are two or more reasonable inferences of intent from the evidence, and one supports a determination that the defendant did not have the required intent. (*Canizales, supra*, 7 Cal.5th at pp. 606-607.) Read in this context, the passage from page 607 is a suggested means to avoid this a problem through jury instruction, but it does not hold that an instruction that fails to include such findings is erroneous.

Cases are not authority for propositions not considered therein. (*People v. Shah* (2019) 38 Cal.App.5th 813, 817.) While the Supreme Court in *Canizales* did indicate that the standard instruction on kill zone liability "should be revised to better describe the contours and limits of the kill zone theory" (*Canizales, supra,* 7 Cal.5th at p. 609), it did not propose language revising the instruction, nor did it indicate it was error to give the standard instruction. The Supreme Court did not purport to determine the propriety of the kill zone instruction in *Canizales*; the language in that opinion defendants rely on does not support finding the kill zone instruction invalid in this case, where the facts support giving such an instruction.

Although defendants objected to the kill zone instruction, they objected to the use of the allegedly inflammatory term "kill zone" or whether the instruction was supported by the evidence; they did not object to the definition of "kill zone" or any other part of the instruction's content, other than the use of the term "kill zone," a contention they do not raise on appeal. When the trial court's instruction is a correct statement of the law, a defendant's failure to request an amplifying or clarifying instruction bars appellate review. (*People v. Ashmus* (1991) 54 Cal.3d 932, 997, abrogated on other grounds recognized in *People v. Yeoman* (2003) 31 Cal.4th 93, 117; *People v. Johnson* (1993) 6 Cal.4th 1, 52, overruled on another ground in *People v. Rogers* (2006) 39 Cal.4th 826, 879.) The trial court gave the standard instruction without material change. " 'The trial court cannot reasonably be expected to attempt to revise or improve accepted and correct jury instructions absent some request from counsel.' " (*People v. Kelly* (1992) 1 Cal.4th 495, 535.) This contention regarding the kill zone instruction is forfeited.

20

Even if we were to consider the claim, any alleged inadequacy in the description of the kill zone is harmless error. The jury was instructed that in order to find a defendant guilty of attempted murder, it had to find beyond a reasonable doubt that the defendant intended to kill the attempted murder victim, Jorge, or everyone in the kill zone. The kill zone here was clear, Valverde and his companions. As recounted above, the evidence that defendants intended to kill everyone in the zone or intended to kill Valverde by killing everyone in the zone was compelling. Any error in the kill zone instruction would thus be harmless beyond a reasonable doubt.[6]

The trial court did not err in giving the kill zone instruction.

## II

## Sufficient Evidence Rocky Intended to Kill Jorge

Rocky argues there was insufficient evidence of his intent to kill to convict him of attempted murder as an aider and abettor. He argues the prosecution was required to prove that he either specifically intended to kill Jorge, or specifically intended to create a kill zone. Not so.

As stated, if Rocky knew that Brandon and Valles intended to shoot and kill indiscriminately, this was sufficient for his conviction for attempted murder as an

---

[6] Another case cited by defendants, *People v. Thompkins* (2020) 48 Cal.App.5th 676, is inapposite. In that case the trial court gave a modified version of CALJIC No. 8.66.1 (attempted murder—concurrent intent) on kill zone liability. (*Thompkins,* at pp. 703-704.) The instruction included the following language: " '[T]he nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity.' " (*Id*. at p. 704.) The Court of Appeal, applying *Canizales*, found there was insufficient evidence to support a kill zone instruction. (*Id*. at p. 705.) Applying *Canizales*, it also found the language quoted above rendered the instruction legally insufficient, and accordingly applied the harmless beyond reasonable doubt standard for harmless error. (*Id.* at pp. 708-710.) *Thompkins* is inapposite because the instruction here, a version of CALCRIM No. 600, does not include this language.

accomplice.  Accordingly, the trial court properly instructed:  "The defendant is subject to prosecution if he committed or attempted to commit the crime or if:  [¶] One, he knew of Brandon Riberal and/or Raymond Valles' and/or another accomplice's criminal purpose to commit murder; [¶] And, two, the defendant intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the commission of murder or participate in a criminal conspiracy to commit murder."  The trial court properly instructed the jury that a conviction for attempted murder required the jury to find that the defendant "intended to kill a person."  "[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill." (*People v. Lee* (2003) 31 Cal.4th 613, 624.)

The evidence was sufficient to show that Rocky gave aid with the intent to kill, even though he may have been unaware of a specific target.  Specifically, the evidence showed Rocky provided Brandon and his fellow gang members with weapons and the rental car that was used in the shooting.  Rocky exchanged text messages with Brandon indicating Rocky was buying and selling guns, silencers, ammunition, and lasers, and providing the same to Brandon.  Rocky asked Brandon when fellow GBG gang member Esteban "McNasty" Monroy's court date was and said he might attend.  Rocky also texted his son pictures of rival gang members.  Several days before the shooting they appeared to be looking for someone.[7]  Rocky instructed Brandon to take the shells out and wipe them down before using them.  Just one day before the shooting, Rocky texted Brandon that he had gone to Walmart to buy hollow-point bullets for two of the guns.

---

[7]     Rocky wrote to Brandon:  "This dudes last name is pounkine or sumtn like that." "Ok he got tats and his ear perst."  "I dnt think thas him."  Brandon replied:  "I dnt think so."

Also, the day before the shooting, Rocky sent Brandon the code to a safe in which he had put the guns. Rocky communicated with Patricia Fajardo, who had a son who was a GBG Norteño, and who had recently been murdered. He wrote her about the gang and said "sc" (Sinners Click) were "fools."

Gang members hung out at Rocky's house. Rocky kept guns at his house. About three or four weeks before the murder, Rocky started bringing more guns to the house. Rocky, Valles, Brandon, and codefendant Yanez would meet at Rocky's house and get out a bag with guns in it. A couple of weeks before the shooting, Rocky shredded some papers that he said contained a hit list. This was evidence from which the jury could infer Rocky was aware that Brandon and Valles intended to kill rival gang members.

Rocky rented the SUV that was used in the shooting. After the shooting, Rocky drove his truck to pick up Brandon, Valles, and their codefendants. Rocky lied to the police when they found him next to the rented SUV, telling them he had received a call from Valles, and that after he picked up Valles someone had shot at their vehicle. Valles told him he had been shot. Rocky said he drove away from the gunfire at a high rate of speed, lost control, and hit the curb. Just before the police put Rocky in handcuffs, he texted Brandon: "The cops don't believe me. I'm fucked." The evidence that Rocky intended to aid and abet Brandon and Valles, and that he had knowledge of their intent to kill was sufficient.

III

Street Terrorism Enforcement and Prevention Act

Section 186.22, also known as the Street Terrorism Enforcement and Prevention Act punishes participation in a criminal street gang. Subdivision (a) of section 186.22 makes it a crime to knowingly and actively participate in a criminal street gang. Subdivision (b) of section 186.22 is an enhancement provision that applies where the defendant committed the underlying felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or

23

assist in any criminal conduct by gang members." Section 190.2, subdivision (a)(22) provides that the defendant be punished by death or imprisonment for life without the possibility of parole if the jury finds true the special circumstance that the defendant intentionally killed the victim while an active participant in a criminal street gang, and the murder was carried out to further the activities of the gang.

A "criminal street gang" is defined in subdivision (f) of section 186.22 as: "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." A "pattern of criminal gang activity" is defined in subdivision (e) of section 186.22 as: "the commission of, attempted commission of, conspiracy to commit, . . . or conviction of two or more of [certain listed offenses], provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons."

Thus, for purposes of the substantive offense and the enhancement in section 186.22, and the special circumstance in section 190.2, subdivision (a)(22), the prosecution must show: (1) a group of at least three persons, (2) whose primary activities are the commission of specified criminal acts, (3) who have a common name or common identifying symbol, and (4) whose members have committed or attempted to commit at least two specified offenses. Additionally, for purposes of the enhancement and special circumstance, the prosecution must show the murder was committed to benefit the gang in furtherance of the gang's activities.

Brandon and Valles argue there was insufficient evidence to find they were members of or affiliated with a criminal street gang. Defendants argue that the claimed

insufficiency of the evidence to support the finding that they were a member of a criminal street gang affects the special circumstance finding pursuant to section 190.2, subdivision (a)(22) and the gang enhancement pursuant to section 186.22, subdivision (b)(1). Brandon and Valles also claim the insufficiency of the evidence affects their conviction for possession of a firearm by an active gang member pursuant to section 25400, subdivision (c)(3), carrying a loaded firearm by an active participant in a criminal street gang pursuant to section 25850, subdivision (c)(3), and active participation in a criminal street gang pursuant to section 186.22, subdivision (f).

Defendants' claims are based on *Prunty, supra,* 62 Cal.4th 59, which was decided while this case was on appeal. *Prunty* examined the requirements of the gang enhancement found in section 186.22, subdivision (b). (*Prunty,* at p. 69.) The *Prunty* prosecution presented expert testimony that Prunty was a Norteño gang member from the Detroit Boulevard subset. (*Id.* at p. 68.) The gang expert gave testimony to support the prosecution's theory that the crime, the attempted murder of an apparent Sureño member and the attempted voluntary manslaughter of an accompanying child, was intended to benefit the Norteños. (*Id.* at pp. 68-69.) The expert presented evidence of predicate crimes to satisfy the "pattern of criminal gang activity" requirement of section 186.22, subdivisions (b) and (e). (*Prunty,* at p. 69.) The predicate crimes to which the expert testified, were crimes committed by Norteño subsets, rather than by the larger Norteño gang, and no evidence was presented that these subsets identified with the larger Norteño group. (*Ibid.*)

The Supreme Court held that where the prosecution seeks to prove the existence of a single criminal street gang by offering evidence of predicate crimes committed by one or more gang subsets, there must be evidence of an "associational or organizational connection uniting those subsets." (*Prunty*, *supra*, 62 Cal.4th at p. 71.) *Prunty* also held that application of the gang enhancement (§ 186.22, subd. (b)) requires the evidence to show that the gang that has committed the "pattern of criminal gang activity" and that has

25

committed the required criminal acts as one of its primary activities, is the same gang the defendant sought to benefit. (*Prunty*, at p. 72.)

We must determine whether there is sufficient evidence in the record to sustain the juries' findings that defendants were active gang participants, and that they committed the crimes for the benefit of a gang and with the intent to promote or assist criminal conduct by members of the gang. (§§ 186.22, 190.2, 25400, subd. (c)(3), 25850, subd. (c)(3).) We shall conclude there was sufficient evidence defendants were members of a criminal street gang, specifically the Norteño gang and its Garden Block gang subset. However, the evidence does not support a finding that the criminal street gang that was shown by evidence of its primary activities and pattern of criminal gang activity (Norteño) was the same gang defendants sought to benefit in committing the crime (Garden Block). We shall therefore reverse the enhancement under section 186.22, subdivision (b) and the special circumstance under section 190.2.

A. *Evidence Defendants Were Gang Participants*

In addition to the evidence recounted here, evidence was presented in the form of jail kites linking all three defendants to the Norteño criminal street gang. Because of hearsay concerns, addressed in the next section, we do not consider that evidence in determining whether sufficient evidence was presented to show that defendants were gang participants.

1. Brandon

Detective Mamaril, the prosecution's gang expert, opined that Brandon was an active member of the Norteño criminal street gang and the Garden Block gang subset. A search of Brandon's house revealed gang-related clothing, specifically an inordinate amount of red clothing. Norteños and their subsets affiliate with the color red. One item was a red belt with a buckle inscribed with the letter "N." Norteños affiliate with the letter N. Another was a hat with the word "Garden" on it. There was also a T-shirt

26

memorializing the death by homicide of Lawrence "Chapo" Avalos, whose funeral featured a banner reading "Mad Dog, Garden Block gang."

Brandon had numerous gang tattoos, including "GB" below his left eye, "GBG" on his neck, "Garden" in large letters across his chest, Garden and Main street signs on his left arm, four dots above his left wrist, "X" in the webbing on his right hand and "4" in the webbing on his left hand, "Block Boy" above his wrists, "Garden" on one leg, and "Blocksta" on the other. Norteños affiliate with the number 14. Mamaril testified that if a non-gang member exhibited gang tattoos, the repercussions could range from being assaulted to being shot.

Photographs on a codefendant Carlos Zendejas's phone showed Brandon throwing gang signs. Significantly, Brandon's counsel stated in closing argument: "Brandon Riberal is and was on March 30, 31st, a criminal street gang member. . . . I think, there is no issue about that. . . . [H]e's got it tattooed on the side of his neck for crying out loud."

2. Valles

Valles also appeared in a photograph on Carlos Zendejas's phone displaying a gang sign. He also had gang-related tattoos, including "GBG" over his left eye, on his stomach, and on his left hand, "1" on his right arm and "4" on his left arm, "ESN" (for East Side Norteño) above his right thumb with the "S" crossed out to show disrespect for Sureños, one dot on his right middle finger and four dots on four fingers on his left hand, and tattoos appearing to commemorate the deaths of fellow gang members.

Valles yelled out "Garden Block" while in the gym at juvenile hall, and chipped paint off the wall to form the letters "GBG." In 2011, Valles was stopped by a member of the Gang Street Enforcement Team while in the company of Juan Ariza, who was tattooed with "Garden Block Gangster" and the letter "N." The pair was armed with a loaded nine-millimeter. While in custody, Valles wrote "GB" on a probation officer's transport vehicle.

27

3. Rocky

Rocky had no prior record of gang-related ties. However, he exhibited a few gang-related tattoos, specifically a Huelga bird, northern star, prison tower, and "Mi Vida Loca." Mamaril opined that Rocky was an active street gang member based on his involvement in the instant case.

B. Evidence Norteño is Criminal Street Gang

Mamaril testified there were over 1,500 Norteños who were documented at the time of the crime. He opined that both the Norteño gang and the Garden Block gang were gangs within the meaning of section 186.22, subdivision (f). Garden Block gang members used signs and symbols particular to their subset, as well as symbols common to other Norteños.

Mamaril testified to the primary activities of the Norteño criminal street gang. He had personally investigated murder, attempted murder, firearms violations, assault with a deadly weapon, shootings from cars, shootings at dwellings, and narcotics trafficking.

Mamaril also testified to three predicate offenses. One offense, robbery, was committed by a member of the Pilgrim Street Norteño subset. Another predicate offense, murder, was committed by two documented Norteño gang members. A pattern of criminal gang activity may be shown by a single offense committed by two or more persons. (§ 186.22, subd. (e).) Thus, the predicate Norteño murder was sufficient to show a pattern of criminal gang activity by the Norteño gang.

Mamaril testified on direct examination that it was his opinion that the crimes at issue were committed for the benefit of the gang. He did not specify what gang the crimes benefited. On cross-examination Mamaril was asked whether the crimes would "bolster the character or whatever of the Norteño criminal street gang[?]" To which he replied: "It helps that particular set, yes." He was then asked whether the infighting between subsets helps the Norteños in general, and he replied that it did not.

28

Thus, the gang that was proven to exist under section 186.22, subdivision (f) was the larger Norteño gang, since this was the gang about which evidence was given regarding primary activities and predicate acts. The gang that was benefitted by the crime, on the other hand, was the Garden Block gang subset. We conclude from this that the evidence showed that the gang that met the definition of section 186.22, subdivision (f) was not the same gang defendants sought to benefit under section 186.22, subdivision (b). *Prunty* teaches that: "Whatever theory the prosecution chooses to demonstrate that a relationship exists, the evidence must show that it is the same 'group' that meets the definition of section 186.22[, subdivision] (f)—i.e., that the group committed the predicate offenses and engaged in criminal primary activities—and that the defendant sought to benefit under section 186.22[, subdivision] (b)." (*Prunty*, *supra*, 62 Cal.4th at p. 72.)

The People argue that there was proof that the subsets were part of the same hierarchical organization, i.e., the Stockton Norteños. However, under the particular circumstances of this case, the prosecution was required to show more than an associational or organizational connection between Garden Block and the Norteños. This is because the prosecution's theory was that the attack was motivated by animosity between warring factions of Norteños. Thus, the attack could not have been for the purpose of benefiting the Norteños in general, because the targets of the attack were also Norteños or Norteño associates. Mamaril's testimony confirmed as much when he conceded that the infighting between the subsets did not help the Norteños. Even if, as the People argue, the evidence shows an associational or organizational connection uniting Garden Block and the Norteños, such evidence is insufficient to satisfy the requirements of section 186.22, subdivision (b) and *Prunty,* because under the circumstances presented, the gang that committed the predicate offenses and engaged in criminal primary activities (Norteño) is not the same gang defendants sought to benefit (Garden Block).

29

As a result, we shall reverse the gang enhancements as to all defendants. We shall also reverse the special circumstance findings. *Prunty* held, "we see no reason [for] the definition of 'criminal street gang' [to] vary in the context of an active participation prosecution." (*Prunty, supra,* 62 Cal.4th at p. 72, fn. 3.) Accordingly, *Prunty* also applies to the definition of a criminal street gang for purposes of the gang-murder special circumstance set forth in section 190.2, subdivision (a)(22).

Our conclusion does not affect the convictions of Brandon and Valles for possession of a firearm by a gang member (§ 25400, subd. (c)(3)), carrying a loaded firearm by a street gang member (§ 25850, subd. (c)(3)), and active participation in a criminal street gang (§ 186.22, subd. (a)). The evidence of their gang membership, set forth above, included gang tattoos, gang clothing, gang pictures, and admitted gang membership. This was sufficient to support the substantive gang crime and the elements of the other crimes that required commission by a gang member.

IV

Expert Gang Testimony

Defendants argue the testimony given by the prosecution's gang expert, Jason Mamaril, was inadmissible hearsay and that it violated their Sixth Amendment right to confrontation. Their arguments are based upon *Sanchez, supra,* 63 Cal.4th 665, which was decided after the case was appealed.

*Sanchez* held that an expert witness may rely on hearsay evidence to support the expert opinion but may not relay the contents of case-specific hearsay to the jury unless there is a hearsay exception. (*Sanchez, supra*, 63 Cal.4th at pp. 675, 680.) If the hearsay is testimonial, it must also satisfy the Sixth Amendment's confrontation clause. (*Sanchez,* at p. 680.)

In *Crawford v. Washington* (2004) 541 U.S. 36, 53-54, 59 (*Crawford*), the United States Supreme court held that the confrontation clause of the Sixth Amendment prohibits the admission of testimonial hearsay unless the declarant is unavailable and the defendant

30

had a prior opportunity to cross-examine the declarant. *Sanchez* considered "the degree to which the *Crawford* rule limits an expert witness from relating case-specific hearsay content in explaining the basis for his opinion." (*Sanchez*, *supra*, 63 Cal.4th at p. 670.) *Sanchez* adopted the following rule: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Id*. at p. 686, fn. omitted.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id*. at p. 676.) "Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*Id*. at p. 689.) Also, "to be testimonial the statement must be made with some degree of formality or solemnity." (*People v. Dungo* (2012) 55 Cal.4th 608, 619.)

Thus, to find a violation of a defendant's right of confrontation, we first identify whether there is a hearsay statement, i.e., an out-of-court statement relied on by the expert for the truth of the matter asserted. If a hearsay statement was admitted, we determine whether the statement was case-specific, or merely background. If case-specific, we determine whether the statement was testimonial. If testimonial, we determine whether the prosecution made a showing of unavailability of the declarant, and whether the defendant had a prior opportunity for cross-examination. We consider each claim of violation separately.

31

A. *Testimony Regarding Garden Block and Sinner's Click Dispute*

Mamaril testified that he listened to over 500 hours of communications between gang members, in which they talked about crimes, gang politics, and talked in code. Defendants argue the conversations were case-specific hearsay. No out-of-court statements were admitted in this portion of Mamaril's testimony, thus there is no hearsay violation.

Mamaril was asked when he first heard of the Garden Block gang. He responded: "About when I got transferred in the Gang Unit in 2012, Garden Block was kind of forming up and became—we have heard of people claiming it. We have heard of them— it being tagged out in the streets." Defendants argue that this was hearsay, and possibly testimonial hearsay. However, there was no out-of-court statement admitted, thus no hearsay. Even if we consider the fact that people claimed being members of Garden Block an admission of an out-of-court statement, the statement was not admitted for the truth, i.e., that the person was a Garden Block member, but only to prove the existence of the Garden Block gang.

Mamaril was asked when he heard of Sinners Click, and he responded, "[a]round the same time." He was asked what he knew about Sinners Click morphing from one type of organization to another, to which he responded: "SC started off as a tagging group. They would go out and tag buildings, walls, um, and just from then they kind of graduated to commit crimes together and were subsequently documented as a Norteño criminal street gang." This testimony contains no out-of-court statement, thus no hearsay.

Mamaril was asked when he found out about problems between Garden Block and Sinners Click. He responded: "Um, possibly coming into the unit. We had already heard that there was some kind of problem between the two sets, it also included other sets that kind of aligned themselves with each one. On the one side with Garden Block you had VLL, which is Vario Latinos Locos, and you also had TS3, or Triple Six

32

gangsters, aligning themselves with Garden Block. And the other side you had West Side Norteños, you had Sinners Click Mob, and you had South Side Stocktone, all kind of allying. They all have their problems and differences with each other, just kind of they got in each other's sides, basically."

Defendants admit that the testimony does not indicate its source but argue it "would have involved more out of court hearsay statements by whoever was disseminating the information." Again, there was no actual hearsay statement admitted.

B. *Documented Gang Members*

Mamaril testified that a number of people, including people associated with the victims, were documented gang members. Mamaril explained the documentation process: "The Stockton Police Department . . . document gang members using a nine criteria system. You have to meet two of those criteria within a five year period to be documented as a gang member." The criteria are: "Admissions, possesses paraphernalia . . . named in court documents, . . . possesses or have been portrayed in photographs or letters as a gang member, . . . an informant, a citizen informant tells us he's a gang member, he's named as a gang member by one of his own members of his own gang and/or a rival, court debriefs, . . . court documents, association with other gang members, possesses a tattoo, and the last one is going to be involved in a gang related incident." Defendants argue all of these methods involve case-specific hearsay, and in many cases testimonial hearsay.

Defendants admit that Mamaril was not specific about how he had documented the gang members about whom he testified. Mamaril testified he had participated in at least 500 gang investigations and 250 gang arrests during his tenure at the Stockton Police Department. He testified he keeps current on gang culture by talking to gang members, going through social media, and staying in touch with other allied agencies. To the extent Mamaril relied on the police department's collected data rather than his own knowledge to determine a subject's gang membership, he did not discuss any specific fact

33

contained in the department's database. Mamaril was permitted to rely on hearsay in forming his opinion regarding gang membership and could tell the jury in general terms that he did so by relating generally the "kind and source of the 'matter' upon which his opinion rests." (*Sanchez, supra*, 63 Cal.4th at pp. 685-686.) The testimony regarding a person's documented gang membership fell within this category and was admissible under *Sanchez*.

C. *Jail Kites*

Detective Mamaril testified that a kite is a small piece of paper that inmates write on to pass information through the jail. Kites typically contain the inmate's name, booking number, charges, claimed gang, and moniker. The prosecution introduced a kite that read: "19 years, Brandon Riberal, . . . [a series of numbers], Little Rocky, GBGSTKN, 7-28-93, twenty years, murder." Detective Mamaril explained the information on the kite was Brandon's name, booking number, moniker, that he was a Garden Block Gangster from Stockton, his birth date, his age, and the charges against him. There was a similar kite for Valles and Rocky. Defendants concede the contents of these kites were not testimonial hearsay under *Sanchez*, but argue they were still hearsay.

To the extent the kites contained names, booking numbers, monikers, and birth dates, they were not admitted for the truth of their contents. They were admitted as proof of defendants' gang ties. Assuming the notation on the kites indicating defendants were from the Stockton Garden Block gang was introduced to prove the truth of the statement, this is the only hearsay at issue, and it was not testimonial. In *Crawford*, the United States Supreme Court recognized that the normal evidentiary rules apply to a nontestimonial hearsay statement: "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." (*Crawford, supra*, 541 U.S. at p. 68.) Improper admission of nontestimonial hearsay is subject to the harmless error test set forth in *People v.*

34

*Watson* (1956) 46 Cal.2d 818, 836. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1308.) Thus, we examine whether it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836.)

We conclude it is not reasonably probable defendants would have received a more favorable result had the kites been excluded. As indicated, the reason for admitting the kites was to show that defendants were part of the Garden Block Norteño gang. The kites were duplicative of this evidence. There was testimony that Brandon and Valles had tattoos identifying their gang membership. Letters were discovered at Brandon's home that had been written to Brandon from other gang members, and that were written in the style that one gang member uses when addressing another. The letters also referred to other gang members. Brandon was identified in several photographs in which he was making gang signs. Brandon and Valles were arrested for robbery in 2010. While in juvenile hall, Valles shouted out, "Garden Block." Also, while in juvenile hall, Valles chipped paint off a wall to make the letters "GB." While in custody for the current offenses, Valles wrote "GB" on a transport vehicle. Valles's cell phone contained gang-related songs and videos. Every time Valles send a text message, it displayed a signature tag of "GBG 14." Rocky's cell phone contained many photos of guns and ammunition, and indicated he was selling guns and ammunition. His phone identified someone as "Buster," which is a gang term for a rival Norteño. One of Rocky's text messages referred to the rival gang Sinners Click, saying they were "fools." Rocky's phone contained numerous text conversations with Brandon. In several conversations they appear to be trying to identify various people. When one person was identified, Rocky texted: "We get that the fool hes just a chump." Most of Rocky's conversations with Brandon focused on guns and ammunition. One of their conversations referred to "SC [Sinners Click] dudes." He also referred to the gang Triple Six in the following text: "Hey baby jerry came by he said u know sum guy from tripple 6 name fready he said hes

the one that got maddog and he said he nos wur smicky lives." Brandon responded: "Find out and triple six is Ridin wit us."

In light of all of this evidence, it is not reasonably probable the judgment would have been more favorable to defendants had the kites not been admitted.

D. *Specific Prior Incidents Involving Brandon and Valles*

Defendants argue Mamaril's testimony about various specific incidents in which Brandon or Valles were involved constituted case-specific testimonial hearsay. We conclude that the persons involved in many of the incidents were presented as witnesses who were subject to cross-examination, thus there was no confrontation violation. As to the other incidents, their admission was harmless beyond a reasonable doubt because they were introduced to prove that Brandon was a gang member—a fact Brandon conceded.

Mamaril testified about a "contact with officers in 2009" in which Brandon and Jerry Perez, a Norteño gang member, reported that Sureño gang members had brandished a firearm at them while yelling "South Side." Cliff Hoffman, a Stockton police officer, testified that he made contact with Brandon and Perez in 2009, and that Brandon reported he was being chased by five or six men in a car who were shouting "South Side" and brandishing a black semiautomatic firearm. Brandon's statement was not testimonial because it was made to deal with an ongoing emergency. (*Sanchez*, *supra*, 63 Cal.4th at p. 689.) The report of the incident made by Hoffman and reviewed by Mamaril did not violate the defendants' confrontation rights because Hoffman was presented at trial and subject to cross-examination. (*People v. Sanchez* (2019) 7 Cal.5th 14, 42.)

Defendants also object to Mamaril's testimony that on January 9, 2010, Brandon was with Mario Zendejas (codefendant Carlos Zendejas's older brother), and Brandon's cell phone cover had "GB" and "X4" scratched into the plastic. The officer who responded to the incident and wrote a report, James Nance, testified at trial. While he did not testify about the scratched phone, he testified to seeing Brandon's gang tattoos and gang-related clothing. He was available for cross-examination. Furthermore, the

36

addition of testimony regarding Brandon's phone was harmless beyond a reasonable doubt as it was duplicative of other indicia of Brandon's gang affiliation.

Mamaril testified that he reviewed an officer contact with Valles on June 13, 2011. Valles had a firearm in his right pants pocket and indicated that he was a Garden Block Norteño. Officers discovered Valles had a Garden Block Gangster tattoo on his chest and an "N" on his upper arm that stood for Norte. Christopher Slate testified that he was a Stockton police officer on June 13, 2011. Slate testified that he stopped and searched Valles and found him in possession of a loaded firearm. He testified that Valles had a "1" tattooed on his upper left arm and a "4" on his upper right arm.[8] Because Slate was available for cross-examination, there was no violation of defendants' confrontation rights.

Mamaril testified he considered "tagging in a location where Mr. Valles was." The tagging was "SKWST." Mamaril testified SK stood for Scrap Killer, but he did not know what WST stood for. The incident referred to appears to have been the same incident described by Alicia Jackson, who was a detention officer at the Juvenile Justice Center. She testified that one of her duties was to make room checks to determine, inter alia, whether there has been any type of graffiti or other damage to the juvenile's cell. She testified that she checked Valles's cell and found several taggings, including SK and WST. Even assuming this was not the incident to which Mamaril testified, his testimony on this incident was harmless beyond a reasonable doubt, since the information in his testimony was duplicative of properly admitted evidence.

---

[8] Officer Slate testified that Valles was with Juan Ariza, and that Ariza had "Garden Block Gangster" tattooed on his chest and the letter "N" on his upper left arm. Mamaril was apparently mistaken about which man had which tattoos. However, defense counsel did not try to resolve the inconsistency, either with Slate or Mamaril.

37

The remaining incidents to which Mamaril testified and defendants object are: (1) a 2008 incident in which Brandon called someone a "scrap" and yelled out the number "13"; (2) a 2012 incident in which Brandon yelled out "Garden Block" during an altercation; and (3) two incidents in juvenile hall in which Brandon tagged "Garden Block Gangsters." Assuming these were assertions of testimonial hearsay, their admission was harmless beyond a reasonable doubt. The incidents were the basis of Mamaril's opinion that Brandon was an active criminal street gang member and relate only to that issue. Brandon admitted at trial that he was a criminal street gang member, but argued he acted in self-defense. Thus, the admission of these incidents was harmless error.

E. *Specific Gang Characteristics*

Mamaril testified regarding the primary criminal activities of the Norteño gang and other information about its operation. Defendants claim these answers were case-specific hearsay, although not testimonial hearsay.

Mamaril was asked which criminal acts listed in section 186.22, subdivision (e) the Norteño criminal gang had committed that he had personally investigated or made arrests upon. He replied that he had conducted investigations into homicide, murder, attempted murder, firearms violation, assault with a deadly weapon, shootings from cars, shootings at dwellings, and narcotics trafficking. As a result, it was his expert opinion that the gang had engaged in a pattern of criminal gang activity, specifically homicide, murder, and assault with a deadly weapon. Mamaril testified that in his training and experience, gang members get respect by doing crimes and putting fear in the community. They lash out at anyone who disrespects them. He testified that he had learned through the course of his investigation that if a rival gang takes action against another gang, that gang would have to immediately react by a physical assault or a shooting. Mamaril testified that guns are the tool of the trade for Stockton gangs. Gang members get guns by purchasing them with the proceeds from a burglary, stealing them,

38

robbing people for guns, and having people who can legally purchase guns purchase them for the gang. Mamaril testified that gang members earn respect when they retaliate, which can be anything from a physical assault, to "something with a gun."

This information was not case-specific but related to the operation of gangs in general. "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Sanchez, supra,* 63 Cal.4th at p. 676.) This information was not related to either particular events or participants. Moreover, it was based on Mamaril's personal investigations. There was no hearsay violation, because this is precisely the type of background information an expert may testify about. As *Sanchez* stated: "[O]ur decision does not affect the traditional latitude granted to experts to describe background information and knowledge in the area of his expertise." (*Id.* at p. 685.)

We conclude there was no reversible error in the admission of the expert's testimony. Many of the claimed hearsay violations were not hearsay or did not impact defendants' right to confrontation and their admission was harmless. As to those instances that are claimed to have violated defendants' confrontation rights, the testimony did not violate *Sanchez* because it was not case-specific, the hearsay declarant was offered as a witness, or the information was harmless beyond a reasonable doubt.

V

Motion to Set Aside Gang-related Charges

Valles and Brandon argue the trial court abused its discretion in denying their motion to set aside the gang-related charges under section 995, resulting in the admission of highly inflammatory gang evidence, which deprived them of their rights to due process and a fair trial. They argue the gang allegations in the indictment were not supported for the same reasons there was insufficient evidence to prove the gang allegations at trial under *Prunty*.

39

The test on a motion to set aside the indictment is whether there was sufficient competent evidence presented to the grand jury to support a conclusion that there was probable cause to believe that a crime had been committed and that the defendant committed it. (*People v. Lopez* (1975) 52 Cal.App.3d 263, 265-266.) Probable cause means, " ' " ' "such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." ' " ' " (*Garcia v. Superior Court* (2009) 177 Cal.App.4th 803, 818.) Probable cause may exist even though there is some room for doubt. (*Ibid.*)

" 'Ordinarily, if there is some evidence in support of the information, the reviewing court will not inquire into its sufficiency. [Citations.] Thus, an indictment or information should be set aside only when there is a total absence of evidence to support a necessary element of the offense charged. [Citations.] [¶] "Although there must be *some* showing as to the existence of each element of the charged crime [citation] such a showing may be made by means of circumstantial evidence supportive of reasonable inferences on the part of the magistrate." [Citation.] "Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information." [Citations.] Thus, the ultimate test is that " ' "*an information will not be set aside or prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.*" ' " [Citation.] [¶] We review the evidence in support of the information to determine whether as a matter of law it is sufficient, not whether the trial court's ruling was reasonable. [Citations.]' " (*Salazar v. Superior Court* (2000) 83 Cal.App.4th 840, 842, quoting *People v. Superior Court (Jurado)* (1992) 4 Cal.App.4th 1217, 1226.)

In this case there was sufficient evidence presented to the grand jury that would lead the grand jury to believe that Brandon and Valles were Norteño gang members, and that they committed the crimes to benefit the Norteño gang.

Mamaril testified that Brandon was an active participant in the Norteño criminal street gang and also in the Garden Block subset. He further testified that Valles was an active participant in the Norteño criminal street gang and the Garden Block subset. He opined that Rocky was an active participant in the Norteño criminal street gang. Mamaril testified that in 2010 Brandon admitted to law enforcement officers that he was a Norteño criminal street gang member and that Valles was also a Norteño. Because Mamaril was giving evidence to the grand jury to establish probable cause, this testimony was admissible hearsay. (§ 872, subd. (b) ["the finding of probable cause may be based in whole or in part upon the sworn testimony of a law enforcement officer . . . relating the statements of declarants made out of court offered for the truth of the matter asserted"].) Mamaril testified to the Norteño gang's primary activities and predicate acts.

Mamaril opined that defendants committed the crime for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. He did not specifically state the gang the crime benefitted; however, his explanation that there were rival gangs, and that Sinner's Click was the rival gang indicates he believed the benefitted gang was Garden Block. At the time of the grand jury testimony, in March 2013, *Prunty*, decided in 2015, was not the law in California, thus there was no requirement that the prosecution prove the gang benefitted was the same gang that the primary and predicate acts established.

In any event, defendants' claim is that the admission of the evidence at trial was prejudicial and irrelevant. However, the same evidence would have been properly admissible to show that defendants were active gang participants, evidence that was relevant to the substantive gang charge under section 186.22, subdivision (a), the conviction for possession of a firearm by an active gang member pursuant to section 25400, subdivision (c)(3), and the conviction for carrying a loaded firearm by an active

participant in a criminal street gang pursuant to section 25850, subdivision (c)(3). Therefore, defendants were not prejudiced under any standard.

VI

Conspiracy

All three defendants were convicted of conspiracy to commit murder. The trial court stayed the conspiracy sentence as to Brandon and Valles. As to Rocky, the trial court imposed a sentence of 25 years to life for conspiracy.

A conspiracy conviction requires proof of the commission of an overt act in furtherance of the conspiracy by one or more of the parties to the conspiracy. (*People v. Johnson* (2013) 57 Cal.4th 250, 257.) "Once one of the conspirators has performed an overt act in furtherance of the agreement, 'the association becomes an active force, it is the agreement, not the overt act, which is punishable.' [Citations.]" (*Id*. at p. 259.)

The trial court instructed the jury that it had to find at least one of the defendants or Yanez or Zendejas committed at least one of 11 described overt acts. Defendants now argue, as they did below, that four of the overt acts were improperly considered because they occurred after the crime of murder was completed. Defendants argue that because it is impossible to tell what overt act or acts the jury found to be true, it is impossible to tell whether the conspiracy conviction was based on a legally correct theory. As a result, they argue, we must reverse not only the conspiracy conviction, but also the murder conviction because it may have been based on the conspiracy to commit murder.

The overt acts the trial court gave in its instruction to the jury were: (1) "defendants are members or associates of the Garden Block Norteño criminal street gang"; (2) "on March 31st, 2012, Defendant Rocky Riberal furnished firearms to Defendants Brandon Riberal and Raymond Valles and two other Garden Block gang members"; (3) "on March 31st 2012, Defendant Rocky Riberal furnished a white Ford Explorer SUV to Defendants Brandon Riberal and Raymond Valles and two other Garden Block gang members"; (4) "on March 31st, 2012, at approximately 12:25 a.m.,

42

Defendant Brandon Riberal drove the Ford Explorer with Raymond Valles and two other Garden Block gang members, and the firearms, in front of Evviva's Lounge, 151 West Alder Street, Stockton, San Joaquin County"; (5) "at this time, Defendants Brandon Riberal and Raymond Valles and two other Garden Block gang members fired multiple firearms multiple times into the crowd of individuals they believed to be rival Sinners Click gang members"; (6) "during the shooting by Defendants Brandon Riberal and Raymond Valles and two other Garden Block gang members shot and killed Eric Valverde"; (7) "also during the shooting, Defendant Brandon Riberal accidentally shot Raymond Valles in the arm"; (8) "following the shooting, Defendant Brandon Riberal drove the Ford Explorer away with Raymond Valles and two other Garden Block gang members, crashing and disabling the vehicle at the intersection of Alder and Center, Stockton"; (9) "Defendants Brandon Riberal, Raymond Valles, and two other Garden Block gang members fled the SUV on foot, hid behind the Taco Bell and called Rocky Riberal to pick them up"; (10) "Defendant Rocky Riberal drove to their location, picked up Defendants Brandon Riberal and Raymond Valles and two other Garden Block gang members and drove them away from the scene"; and (11) "when later contacted by Stockton police officers, Defendant Rocky Riberal said he was the driver of the SUV at the time of the accident." The four overt acts to which defendants object are numbers eight through 11.

An act committed subsequent to the completion of the crime that is the object of the conspiracy is not an overt act in furtherance of the conspiracy. (*People v. Zamora* (1976) 18 Cal.3d 538, 560.) Accordingly, defendants argue overt acts eight through 11 do not qualify because they occurred after the shooting. However, a murder is completed not when the shots are fired, but when the victim dies. (*People v. Celis* (2006) 141 Cal.App.4th 466, 471.) Here, the expert testimony of the medical examiner indicated Valverde lived three to 10 minutes after he was shot.

Although it is impossible to tell which of the challenged overt acts happened within three to 10 minutes of the shooting, or indeed whether Valverde lived three minutes or more, the evidence indicates that overt act eight certainly occurred within the first three minutes, and the evidence is sufficient for the jury to conclude overt act nine did as well. One eyewitness indicated the SUV left at a high rate of speed approximately 45 to 50 seconds after the gunfire stopped. Kevin B., who lived about one block away from Evviva, testified that when he heard the gunshots west of his home he immediately stepped outside onto his front porch. There he saw the white Ford Explorer driving toward him on Alder at about 60 miles an hour. He heard the vehicle crash. It is less clear when the 10th act occurred, and unlikely the 11th occurred before Valverde died. Thus, it was error for the trial court to give the jury the option of finding that those latter two overt acts could suffice as an overt act for the purpose of conspiracy to commit murder.

However, the jury only needed to find that one overt act was committed by one of the conspirators. (*People v. Pierce* (1952) 110 Cal.App.2d 598, 610; *People v. Russo* (2001) 25 Cal.4th 1124, 1134.) We conclude that allowing the jury to consider overt acts 10 and 11 was harmless. In reaching this conclusion we must determine, "beyond a reasonable doubt, that the jury based its verdict on a legally valid theory." (*People v. Chun* (2009) 45 Cal.4th 1172, 1203.) This happens if " 'the jury verdict on other points effectively embraces' " the one at issue, but also if " 'it is impossible, upon the evidence, to have found what the verdict *did* find without finding this point as well.' " (*Id.* at p. 1204.)

As indicated, the jury only had to find that one of the conspirators committed one of the overt acts. Overt act number six stated that Valverde was shot and killed in the shooting by Brandon, Valles, and the other two gang members. As the Brandon and Valles jury found Brandon and Valles guilty of the first degree murder of Valverde, this verdict effectively embraces the verdict on the conspiracy count. Likewise, Rocky's jury

44

found true the allegation that Rocky was a principal in the murder, and that a principal intentionally and personally discharged a firearm causing great bodily injury or death to Valverde.  As such, any error in also naming two overt acts that occurred after Valverde's death was harmless.

## VII

### Instructional Error on Counts 6 and 7

Brandon and Valles argue the court's instruction on count 6, carrying a concealed firearm by a gang participant, and count 7, carrying a loaded firearm by a gang participant, failed to instruct the jury on the elements of the offenses, resulting in reversible error.  The People agree.

The court instructed the jury with CALCRIM No. 2542.  The instruction stated in pertinent part:  "If you find Brandon Riberal or Raymond Valles guilty of unlawfully carrying a concealed firearm on his person or carrying a loaded firearm under Counts 6 and 7, you must then decide whether the People have proved the additional allegation that the defendant was an active participant in a criminal street gang."  The Bench Notes for CALCRIM No. 2542 state that this instruction "**must** be given with the appropriate instruction defining the elements of carrying a concealed firearm, CALCRIM No. 2520, 2521, or 2522, or carrying a loaded firearm, CALCRIM No. 2530."[9]  (Judicial Council of Cal., Crim. Jury Instns. (2019) Bench Notes to CALCRIM No. 2542, p. 421.)  The trial court did not give CALCRIM Nos. 2520, 2521, 2522, or 2530.

The trial court has a sua sponte duty to instruct on the essential elements of the charged offense.  (*People v. Merritt* (2017) 2 Cal.5th 819, 824.)  In *People v. Cummings*

---

[9]    These instructions set forth the elements of the substantive charges of carrying a concealed firearm on the person (§ 25400, subd. (a)(2)), carrying a concealed firearm within a vehicle (§ 25400, subd. (a)(1)), causing a concealed firearm to be carried within a vehicle (§ 25400, subd. (a)(3)), and carrying a loaded firearm (§ 25850, subd. (a)), respectively.

(1993) 4 Cal.4th 1233, the Supreme Court held that failure to instruct on the elements of a charged crime was serious constitutional error and reversible per se. However, more recently, in *Merritt*, at page 822, the court held that the error is subject to a harmless analysis if it does not " ' "vitiat[e] *all* the jury's findings." ' " Accordingly, such error may be harmless "if the reviewing court determines beyond a reasonable doubt that it did not contribute to the verdict. . . . Or, slightly differently, . . . 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*Merritt,* at p. 827.)

When the trial court omits some elements of the offense, but those elements were uncontested and supported by overwhelming evidence, the error is not necessarily prejudicial. (*People v. Mil* (2012) 53 Cal.4th 400, 411.) We must determine, then, whether it is clear beyond a reasonable doubt that the jury would have found defendants guilty of counts 6 and 7 absent the error.

Count 6 alleged that defendants carried a firearm concealed upon their persons or within a vehicle, and that they were active participants in a criminal street gang in violation of section 25400, subdivision (c)(3). To prove this crime the prosecution was required to show: (1) the defendant carried within a vehicle a firearm capable of being concealed on the person, (2) the defendant knew the firearm was in the vehicle, (3) the firearm was substantially concealed within the vehicle, and (4) the vehicle was under the defendant's control or direction. (CALCRIM No. 2521.)

It is clear beyond a reasonable doubt that a rational jury would have found Brandon guilty of count 6 even if the trial court had given a proper instruction. The jury properly found true the special circumstance allegation that Brandon discharged a firearm from a vehicle with intent to kill in violation of section 190.2, subdivision (a)(21), and found him guilty of shooting a firearm from a vehicle in violation of section 26100, subdivision (c). Valles testified that Brandon was driving the SUV. Additionally, Brandon's father rented the SUV, and Brandon's fingerprints were on a CD that was

46

found in the driver's side door pocket. Shell casings found in the floorboard of the driver's seat indicated Brandon was shooting a .45 automatic. Valles indicated it was a handgun. Not long before the shooting, Rocky told his girlfriend that Brandon's gun was a .45-caliber handgun with a laser sight.

Thus, there was evidence Brandon carried a gun capable of being concealed on his person (a .45-caliber handgun) in a vehicle that substantially concealed the gun, that he knew the gun was in the vehicle because he fired it, and that the vehicle was under his control or direction because he was driving. Moreover, Brandon did not contest that he committed the actions of which he was accused. Instead, he claimed he acted in self-defense.

As to Valles's conviction for count 6, we must reverse because he was a passenger in the SUV, and no evidence was presented that he directed or controlled the SUV.

Count 7 alleged that defendants carried a loaded firearm and were active participants in a criminal street gang in violation of section 25850, subdivision (c)(3). To prove this crime the prosecution was required to show: (1) the defendant carried a loaded firearm on his person or in a vehicle, (2) the defendant knew that he was carrying a firearm, and (3) the defendant was in a public place or on a public street. (CALCRIM No. 2530.)

The evidence was overwhelming that both defendants were guilty of violating section 25850, subdivision (c)(3). As previously indicated, Brandon did not claim that he did not shoot a firearm from the SUV. His only defense was self-defense. Valles also claimed self-defense. Valles admitted in a recorded interview that he shot four times with the handgun he was carrying in the SUV. The shooting occurred as the SUV was traveling down Alder, a public street. This was overwhelming evidence of defendants' guilt on count 7.

47

## VIII

### Reopening of Closing Arguments

Rocky's jury sent the following question to the trial court during deliberation: "Green team cannot agree on one of the four requirements for aiding and abetting. Instruction 401. It appears the other counts are dependent on full agreement regard . . . aiding and abetting. We seem to be stuck." After some discussion, the trial court decided to give CALCRIM No. 3551 and to send a note asking the jury a follow-up question.[10] The follow-up question was: "Are you asking if aiding and abetting applies to all counts or charges?" The jury returned the following note: "Yes, we would like to know if aiding and abetting applies to all charges and counts." The jury also asked: "Does aiding and abetting for Rocky apply specifically to his knowledge and intent to aid Brandon and the others in the killing of someone that night, March 30th of 2012—That Rocky knew when he gave the keys to Brandon that night that a killing would take place or does aiding and abetting mean he knew of their intention to commit a homicide at any given time. Also, can you be guilty of conspiracy if not guilty of murder. Is the

---

[10] The court gave CALCRIM No. 3551 as follows: "Sometimes juries that have had difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict on one or more counts. [¶] Please consider the following suggestions. Do not hesitate to re-examine your own views. Fair and effective jury deliberations require a frank and forthright exchange of views. Each of you must decide the case for yourself and form your individual opinion after you have fully and . . . completely considered all of the evidence with your fellow jurors. [¶] It is your duty as jurors to deliberate with the goal of reaching a verdict if you can do so without surrendering your individual judgment. [¶] Do not change your position just because it differs from that of the other jurors, or just because you or others want to reach a verdict. Both the People and the defendant are entitled to the individual judgment of each juror. It is up to you to decide how to conduct your deliberations. You may want to consider new approaches in order to get a fresh perspective. Let me know whether I can do anything to help you further, such as give additional instructions or clarify instructions that I have already given you. [¶] Please continue your deliberations at this time. If you wish to communicate with me further, please do so in writing, using the form my bailiff has given you."

conspiracy a blanket charge or just specific for the crime committed on March 31st of 2012?"

The jury later sent a note to the court stating that the jurors could not reach an agreement on any of the counts. The trial court indicated it would bring the jury in and ask whether additional instructions or additional argument would help reach a verdict. If the jury indicated additional argument would help, the court would allow each side 30 minutes to give additional argument. If it indicated nothing would be helpful, then the trial would be over. Defense counsel objected that the jury had heard enough argument and that he was not prepared to do more argument. The prosecutor agreed with the trial court's proposal. The trial court pointed out that there had been 40 days of testimony, that the jury deliberated one day, then replaced a juror and deliberated two more days.

The jurors were brought in and asked if any of them believed additional deliberation or additional instructions or additional brief argument by the attorneys would help. The court said the jury could submit questions that could be addressed by the attorneys in closing argument. The court proceeded to ask each juror if additional deliberations or argument would help. Two jurors said it would help. The court told the jury it would give each side an opportunity to give a 30-minute closing argument. The court told the jury to write down any questions it wanted the attorneys to address in their argument.

Rocky's counsel argued that aiding and abetting referred to the specific crime of murder on the date the murder occurred. The prosecutor argued the jury should reread instruction number 400, and the natural and probable consequences instruction.[11]

---

[11]     Instruction 400 (aiding and abetting) stated: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator. [¶] Under some specific circumstances,

49

The jury retired to deliberate after the supplemental argument at 10:10 a.m. They returned a verdict at 11:50 a.m.

Rocky argues the trial court abused its discretion in allowing the parties additional time for closing argument. He acknowledges that section 1094 gives the trial court discretion to depart from the prescribed order of a jury trial, but argues such discretion was abused because the trial court coerced the jury into reaching a verdict. Rocky cites *United States v. Evanston* (9th Cir. 2011) 651 F.3d 1080 (*Evanston*) in support of his argument, but we conclude that case is not controlling.

In *Evanston*, the defendant stood trial for assaulting his live-in girlfriend. (*Evanston, supra*, 651 F.3d at p. 1082.) Evanston claimed in the two and one-half-day trial that the victim's injuries occurred when she struck her face on a nightstand during a fight. (*Ibid*.) The girlfriend testified her injuries occurred when Evanston choked and hit her. (*Ibid*.) The jury deliberated for five hours over two days before advising it could not reach a verdict. (*Ibid*.) The court gave an *Allen*[12] charge, which was described as a

---

if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."

The natural and probable consequences instruction stated in pertinent part: "The defendant is charged in Count 5 with shooting from a motor vehicle and in Count 1 with murder. [¶] You must first decide whether the defendant is guilty of shooting from a motor vehicle. If you find the defendant is guilty of this crime, you must then decide whether he is guilty of murder. [¶] Under certain circumstances, a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time. [¶] To prove that the defendant is guilty of murder, the People must prove that: One, the defendant is guilty of shooting from a motor vehicle; [¶] Two, during the commission of shooting from a motor vehicle a co-participant in that offense committed the crime of murder; [¶] And, three, under all the circumstances, a reasonable person in the defendant's position would have known that the commission of murder was a natural and probable consequence of the commission of the shooting from a motor vehicle. . . . ."

[12]     *Allen v. United States* (1896) 164 U.S. 492.

50

" 'dynamite charge[], because of [its] ability to "blast" a verdict out of a deadlocked jury.' [Citation.]" (*Id*. at p. 1082, fn. 4.)

After three more hours of deliberation, the jury reported it was still deadlocked. (*Evanston*, *supra*, 651 F.3d at p. 1083.) The trial court asked the jury to identify which points it wanted reargued, and the jury responded, "witness credibility and how the victim's injuries were caused." (*Ibid*.) Additional argument was had and after more deliberation, the jury returned a guilty verdict. (*Ibid*.)

*Evanston* held that the trial court's broad discretion was limited to answering legal, not factual questions. (*Evanston*, *supra*, 651 F.3d at p. 1086.) It held that "[t]he supplemental arguments . . . intruded upon the jury's fact-finding role . . . . The district court ordered, and the parties presented, additional arguments regarding matters of fact." (*Id*. at pp. 1087-1088.)

*Evanston* is not, of course, binding on this court. (*People v. Avena* (1996) 13 Cal.4th 394, 431.) This court has held that a trial court is authorized to reopen closing argument to assist the jury in overcoming a deadlock where the court makes no coercive remarks and gives no coercive instructions. (*People v. Young* (2007) 156 Cal.App.4th 1165, 1170-1172.) We held that the procedure is "neutral, giving each side a brief opportunity to argue." (*Id*. at p. 1172.) Furthermore, California Rules of Court, rule 2.1036 lists "[p]ermit attorneys to make additional closing arguments" as one possible further action a trial court might take after a jury reports that it has reached an impasse in its deliberations.

We conclude the trial court did not abuse its discretion in allowing further closing argument.

IX

Valles's LWOP Sentence

Valles, who was 17 when the crimes were committed, argued in his original briefing that his sentence of life without the possibility of parole violates the Eighth

51

Amendment's prohibition against cruel and unusual punishment. He argues in supplemental briefing that he is entitled to a juvenile transfer hearing pursuant to section 3051, which was passed by the voters after trial in this matter, but while the appeal was pending. We agree, and shall conditionally reverse the judgment and remand the matter to the juvenile court for a transfer hearing.

Proposition 57 amended Welfare and Institutions Code section 602 to give juvenile courts exclusive jurisdiction over any minor 17 and under who violates the law. It amended Welfare and Institutions Code section 707 to provide that the district attorney may move to transfer certain minors who are 14 or older from juvenile court to criminal court. *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 304, held that Proposition 57 applies to all juveniles charged directly in adult court whose judgment was not final when Proposition 57 was enacted in November 2016. Valles is one such juvenile. Following *Lara*, the Courts of Appeal in this state have conditionally reversed the juvenile's conviction and remanded to juvenile court to conduct a transfer hearing. If the juvenile court finds it would not have transferred the juvenile to an adult court, it is directed to treat the convictions as juvenile adjudications. If the juvenile court determines it would have transferred the minor to adult court, then the convictions and sentence are directed to be reinstated. (*People v. Hargis* (2019) 33 Cal.App.5th 199, 211; (*People v. Garcia* (2018) 30 Cal.App.5th 316, 330; *People v. Phung* (2018) 25 Cal.App.5th 741, 763; *People v. Carter* (2018) 26 Cal.App.5th 985, 1001.)

Accordingly, we shall conditionally reverse Valles's conviction and remand to the juvenile court to conduct a transfer hearing.

Valles's Eighth Amendment claim is now moot with the passage of section 3051, subdivision (b)(4), which provides Valles with the possibility of release after 25 years of imprisonment if the Board of Parole Hearings determines, after conducting a youth offender parole hearing, that he is suitable for parole. (*Franklin, supra*, 63 Cal.4th at p. 268.)

The parties do not address whether we should remand for a *Franklin* hearing. In *Franklin*, decided after the appeal was filed in this case, the Supreme Court remanded the case to the trial court "for a determination of whether [the defendant] was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing." (*Franklin, supra*, 63 Cal.4th at p. 284.) Such information includes " 'the juvenile offender's characteristics and circumstances at the time of the offense[;]' " statements by " '[f]amily members, friends, school personnel, faith leaders, and representatives from community-based organizations with knowledge about the individual before the crime[;]' " and " 'psychological evaluations and risk assessment instruments' used by the Board [of Parole Hearings] in assessing growth and maturity.' " (*Id.* at pp. 283-284.)

The trial court had letters from Valles's friends and family, and the court considered the factors set forth by the United States Supreme Court in *Miller v. Alabama* (2012) 567 U.S. 460, which held in pertinent part that the Eighth Amendment forbids a mandatory sentence of life in prison without the possibility of parole for juvenile offenders. (*Id.* at p. 479.) The factors considered by the trial court were: (1) the juvenile's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) information "regarding the family and home environment that surrounds the juvenile—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional"; (3) information "regarding the circumstances of the homicide, including the extent of the juvenile defendant's participation in the conduct and the way familial and peer pressures may have affected him"; (4) information "as to whether the offender might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors, including on a plea agreement, or his incapacity to assist in his own attorneys"; and (5) information "bearing on the possibility of rehabilitation."

Even though the trial court considered these factors under *Miller v. Alabama*, "[p]rior to *Franklin* . . . there was no clear indication that a juvenile's sentencing hearing would be the primary mechanism for creating the record of information required for a youth offender parole hearing 25 years in the future." (*People v. Jones* (2017) 7 Cal.App.5th 787, 819.) Because it is unclear that Valles understood the importance of developing the type of record contemplated by *Franklin*, we will remand for a *Franklin* hearing in the event the juvenile court determines transfer to adult court is appropriate.

X

Discretion To Strike Firearm Enhancements

At the time defendants were sentenced, Penal Code sections 12022.5 and 12022.53 did not allow the trial court to strike the firearm enhancements in the interest of justice. (See former §§ 12022.5, subd. (c), 12022.53, subd. (h); Stats. 2010, ch. 711, § 5.) Effective January 1, 2018, Senate Bill No. 620 amended these sections to provide that the court may strike or dismiss an enhancement in the interest of justice. (Stats. 2017, ch. 682, §§ 1 & 2.)

All three defendants argue remand is appropriate to permit the trial court to exercise its discretion to strike the firearm enhancements. The People argue remand is not appropriate because the record shows the trial court would not have exercised its discretion to strike the enhancements. The People point to the serious nature of the crimes, the appellants' lack of remorse, and this statement by the trial court: "[A] lot of [defendants'] family members in their letters were asking me to exercise mercy. But there also has to be justice. And, unfortunately, when you're convicted of murder, you don't get a second chance."

"Generally, when the record shows that the trial court proceeded with sentencing on the erroneous assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) We will follow the

general rule and allow the trial court the opportunity to exercise its discretion in the first instance.

## XI

## Cumulative Error

Brandon and Valles argue the cumulative effect of the errors requires reversal. Although we have concluded the trial court committed some errors, we conclude there is no reasonable possibility that these errors considered cumulatively, affected the jury's verdicts.

## DISPOSITION

Raymond Valles: The gang special circumstance (§ 190.2, subd. (a)(22)) to count 1 and the gang enhancements to counts 1, 2, 4, and 5 (§ 186.22, subd. (b)(1)) are reversed, as is count 6. We conditionally reverse the remainder of the judgment against Valles and remand the matter to the juvenile court with direction to conduct a transfer hearing no later than 90 days from the filing of the remittitur. If the juvenile court determines at the transfer hearing that it would not have transferred Valles to a court of criminal jurisdiction, Valles's criminal convictions and enhancements, with the exception of count 6, the gang enhancements, and gang special circumstance, shall be deemed to be juvenile adjudications as of that date, and the juvenile court shall conduct a dispositional hearing, including consideration of whether to dismiss or strike the sections 12022.5 and 12022.53 firearm enhancements. If the juvenile court determines at the transfer hearing that it would have transferred Valles to a court of criminal jurisdiction, the judgment of conviction, with the exception of count 6, the gang enhancements, and gang special circumstance shall be reinstated as of that date. In that case, the criminal court is directed to: (1) hold a resentencing hearing at which it may exercise its discretion to strike the firearm enhancements; (2) resentence Valles with or without the firearm enhancements; (3) conduct a *Franklin* hearing; and (4) forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.

55

Brandon Rocky Riberal:  The gang special circumstance (§ 190.2, subd. (a)(22)) to count 1 and the gang enhancements to counts 1, 2, 4, and 5 (§ 186.22, subd. (b)(1)) are reversed.  The judgment of conviction is otherwise affirmed, but the sentence is vacated and the matter is remanded to the trial court for resentencing and to consider whether to strike the firearm enhancements imposed under sections 12022.53 and 12022.5.  The trial court shall forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.

Rocky Riberal:  The gang enhancements (§ 186.22, subd. (b)(1)) to counts 1, 2, 4, and 5 are reversed.  The judgment of conviction is otherwise affirmed, but the sentence is vacated and the matter is remanded to the trial court for resentencing and to consider whether to strike the firearm enhancements imposed under sections 12022.53 and 12022.5.  The trial court shall forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.


  /s/  
  BLEASE, J.


We concur:


  /s/  
RAYE, P. J.


  /s/  
BUTZ, J.*

---

\* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.